PROCEL LEVINE, LLP
Brian Procel (CA Bar No. 218657)
brian@procellevine.com
Jeremiah M. Levine (CA Bar No. 288377)
401 Wilshire Boulevard, 12th Floor
Santa Monica, California 90401
Telephone: (424) 788-4538

Attorneys for Plaintiffs Young-Jik Lee, M.D. and YJ Lee, M.D. Corp.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

YOUNG-JIK LEE, M.D., AN INDIVIDUAL; AND YJ LEE, M.D. CORP., A CALIFORNIA CORPORATION,

Plaintiffs,

v.

SEOUL MEDICAL GROUP, INC., A CALIFORNIA PROFESSIONAL CORPORATION; SWAN PRACTICE HOLDINGS, P.C., A CALIFORNIA PROFESSIONAL CORPORATION; SMG AGGREGATOR, LLC, A DELAWARE LIMITED LIABILITY COMPANY; ASCEND CAPITAL PARTNERS MANAGER, L.P., A DELAWARE LIMITED PARTNERSHIP; ASCEND SMG AGGREGATOR, L.P., A DELAWARE LIMITED PARTNERSHIP; ADVANCED MEDICAL MANAGEMENT, INC., A CALIFORNIA CORPORATION; AND DOES 1–20, INCLUSIVE,

Defendants.

Case No. 2:26-cv-___________

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

**COMPLAINT FOR:**

(1) Violation of Section 7 of the Clayton Act (15 U.S.C. § 18);

(2) Monopolization (15 U.S.C. § 2);

(3) Attempted Monopolization (15 U.S.C. § 2);

(4) Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)

**DEMAND FOR JURY TRIAL**

Plaintiffs Young-Jik Lee, M.D. ("Dr. Lee") and YJ Lee, M.D. Corp. (the "Lee Practice") (together, "Plaintiffs"), by and through their undersigned counsel, bring this action against defendants Seoul Medical Group, Inc. ("SMG"); Swan Practice Holdings, P.C. ("Swan"); SMG Aggregator, LLC ("SMG Aggregator"); Ascend Capital Partners Manager, L.P. ("Ascend Capital"); Ascend SMG Aggregator, L.P. ("Ascend SMG Aggregator"); Advanced Medical Management, Inc. ("AMM"); and Does 1 through 20 (collectively, the "SMG Enterprise," the "Enterprise," or "Defendants"), and allege as follows, on personal knowledge as to their own acts and on information and belief as to all other matters:

## I. NATURE OF THE ACTION

1. This case concerns an attempt by a private-equity firm to monopolize a segment of the healthcare industry in Los Angeles and Orange Counties.

2. The misconduct alleged in this Complaint has resulted in lower pay for doctors, less competition, and patients with fewer healthcare options.

3. Korean-American seniors using Medicare Advantage need doctors who speak Korean. Those doctors are scarce. Health plans contract with those doctors through independent practice associations, or IPAs. IPAs contract with the doctors and receive a fixed monthly payment for each patient attributed to them. Any IPA that controls the Korean-speaking doctors controls the patients, and the money that comes with them.

4. SMG is the leading healthcare network that serves Korean-American seniors in Los Angeles and Orange Counties.

5. In 2023, the private-equity sponsor Ascend Capital Partners bought SMG for $850 million.

6. SMG was already, in Defendants' words, "the largest Korean-American-focused IPA."

7. Ascend acquired SMG through its affiliate Defendant Swan Practice Holdings, P.C. ("Swan").

8. The Enterprise did not stop when it acquired SMG.

9. In early 2025, the Enterprise acquired its closest rival, Korean-American Medical Group, Inc. ("KAMG").

10. Defendants announced the deal as the combination of "the two leading Asian-American-focused medical groups and physician networks in the United States."

11. Together, the two networks serve about two-thirds of the Korean-senior patients in Los Angeles and Orange Counties and account for most of the Korean-speaking physicians who serve them.

12. The Enterprise now owns both of the leading medical groups built to serve Korean-American seniors in Los Angeles and Orange Counties.

13. That concentration far exceeds the levels at which the antitrust laws presume a merger to be illegal.

14. The KAMG acquisition is illegal, and it must be unwound.

15. Defendants never submitted the deal to the Department of Justice or the Federal Trade Commission.

16. The KAMG acquisition completed the Enterprise's control of this market.

17. It removed the only other Korean-serving network of comparable size.

18. The Enterprise now controls the doctors, the patients, and what the doctors are paid.

19. After these mergers closed, the Enterprise has used its market power to extract anticompetitive advantages in all directions.

20. Defendants have engaged in anticompetitive conduct with respect to the health plans they contract with.

21. Eight days after announcing the deal, the Enterprise's lawyers told Astiva Health ("Astiva"), a health plan serving Korean seniors, that SMG's members, "coupled with KAMG's," made up "one-third of Astiva's total membership."

22. Defendants then used their market power to demand at least $450 per member per month for an average-risk member. In 2024, Astiva had paid SMG about $285 per member per month for Part B services.

23. Defendants used their monopoly to demand a steep increase in what Astiva paid.

24. To achieve that result, Defendants threatened Astiva with "immediate termination of the agreement."

25. Six weeks later, SMG sued Astiva, alleging that without SMG's network Astiva "would not be able to fulfill" its obligations for "network adequacy, cultural competency, and continuity of care."

26. Next the Enterprise turned on its own doctors.

27. For years before the merger, SMG paid Dr. Lee, one of the network's top physicians, a performance bonus of more than [redacted] a year. SMG pays each year's bonus the following spring.

28. In the spring of 2025, months after the merger, SMG paid a bonus to only a handful of physicians in its entire network. It cut Dr. Lee's about in half, to a little over [redacted].

29. In 2026, SMG paid Dr. Lee no bonus, and few, if any, physicians in the network received one.

30. And after terminating the Lee Practice in May 2026, SMG sent it, and primary care doctors across the network, a form amendment cutting base pay for dual-eligible patients [redacted] [redacted].

31. The same form capped each doctor's total pay, base and incentives combined, [redacted].

32. It also raised the fee every doctor must pay for its own management company, which the doctors are required to use, from about 10 percent to about 25 percent of the network's revenue.

33. The Enterprise cut physician pay even though the Centers for Medicare & Medicaid Services ("CMS") raised what it pays the Medicare Advantage plans that fund SMG in both 2025 and 2026.

34. The Enterprise's ability to cut payment to doctors while realizing increased revenue is indicative of a lack of competition.

35. The Enterprise's misconduct is even more egregious: it told state regulators one thing and did another.

36. To win clearance of the KAMG deal, the Enterprise told California regulators that its networks are "by default, non-exclusive, meaning that [primary care physicians] can choose to participate in other IPAs."

37. But once the deal closed, the Enterprise demanded that a Korean-speaking primary care physician deal with it exclusively.

38. She refused. SMG then terminated her.

39. The Enterprise also controls patients. Medicare Advantage patients are attributed to an IPA through their primary care doctor.

40. When the Enterprise terminates a doctor, it "block transfers" his or her patients to other doctors in its network.

41. A doctor who attempts to move to another IPA has a virtually insurmountable obstacle if he or she attempts to take patients to the new IPA.

42. And the patients lose the doctor of their choice.

43. That is what happened to Dr. Lee.

44. He has cared for Korean-speaking seniors in Los Angeles for more than 20 years.

45. Swan has admitted in court-filings that Dr. Lee is "one of the top revenue-generating participants in SMG's network."

46. On May 29, 2026, SMG terminated the Lee Practice.

47. The Enterprise then contacted his patients and reassigned them to its own physicians.

48. The Enterprise's treatment of Dr. Lee has deterred the other Korean-speaking doctors at SMG from moving to rival networks.

49. Doctors lose pay and the freedom to work elsewhere. Korean-speaking seniors were moved away from doctors who had treated them for years in their own language, to physicians they did not choose.

50. Rivals like Center IPA ("Center") cannot assemble the network they need to compete.

51. The Enterprise followed the oldest play in the monopolist's playbook: buy your rivals, then control what any new rival would need.

52. This is not competition on the merits.

53. The Enterprise bought its competitor and locked the doors.

54. Through that conduct it has monopolized, and attempted to monopolize, the market for managed-care network services sold to Medicare Advantage plans for Korean-speaking seniors in Los Angeles and Orange Counties.

55. And as the dominant buyer of the services of the Korean-speaking physicians who treat those seniors, it has monopsonized, and attempted to monopsonize, the market for those services.

56. The KAMG acquisition violates Section 7 of the Clayton Act.

57. The acquisitions, the lock-in of physicians, and the capture of their patients violate Section 2 of the Sherman Act and the California Unfair Competition Law.

58. Plaintiffs seek, among other relief, a judgment declaring the KAMG acquisition unlawful and ordering its divestiture; a permanent injunction against the block-transfer capture scheme; and treble damages, costs, and attorneys' fees.

## II. JURISDICTION AND VENUE

59. This action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiffs sue under Sections 4 and

16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 26.

60. This Court has supplemental jurisdiction over Plaintiffs' claims under California law pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as the federal antitrust claims.

61. Defendants transact business and are found within this District within the meaning of 15 U.S.C. §§ 15 and 22, and are subject to personal jurisdiction here. SMG and Swan are California professional corporations that operate in Los Angeles and Orange Counties; the remaining Defendants direct and manage the conduct alleged here through operations in this District.

62. Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to the claims occurred here, the acquisition and conduct at issue restrain competition here, and Defendants may be found and transact business here.

63. Defendants' conduct occurs in and substantially affects interstate commerce. The SMG Enterprise contracts with national Medicare Advantage health plans. It receives payments funded by the federal Medicare program, which the Centers for Medicare & Medicaid Services administers. It operates risk-bearing entities in at least eight states. And it is owned through Delaware entities controlled by a national private-equity sponsor.

## III. THE PARTIES

### A. Plaintiffs

64. Plaintiff Young-Jik Lee, M.D. is a physician licensed by the State of California and a resident of Los Angeles County.

65. He has practiced primary care medicine in Los Angeles for more than 20 years, serving a predominantly Korean-American, Korean-language-preferring Medicare Advantage panel.

66. Dr. Lee is a seller of Korean-speaking physician services and a participant in the input market described below.

67. Dr. Lee continues to sell his services in that market and is threatened with continuing injury from the acquisition and the conduct challenged here.

68. Plaintiff YJ Lee, M.D. Corp. (the "Lee Practice") is a California corporation wholly owned by Dr. Lee, with its principal place of business in Los Angeles.

69. Since June 2023, Dr. Lee has conducted his independent medical practice through the Lee Practice.

70. The Lee Practice was the party to the primary care physician agreement under which SMG paid capitation for Dr. Lee's professional services, until SMG terminated that agreement on May 29, 2026. Dr. Lee was a party in his own name to a separate agreement with SMG under which SMG paid the performance bonus for his services, and SMG paid that bonus to him individually.

71. The Lee Practice is a seller of Korean-speaking primary-care physician services and a participant in the input market described below.

72. The Enterprise did not acquire the Lee Practice in the 2023 transaction.

**B. <u>Defendants</u>**

73. SMG is a California professional corporation with its principal place of business in this District.

74. SMG is a risk-bearing organization and independent practice association that contracts with Medicare Advantage health plans on a capitated basis and administers a network of independent physicians serving the plans' enrollees.

75. SMG is the operating core of the Enterprise challenged here.

76. Swan is a California professional corporation formed in 2023. It is 100% owned by Dr. Richard Park ("Dr. Park"), a co-founder of Ascend Partners and the former chief executive of an urgent-care company.

77. Swan acquired SMG in October 2023 and acquired KAMG in 2025.

78. By its own account to California regulators, Swan "engages in no business activities other than owning" SMG, "does not serve patients or own facilities," and is not a health care provider.

79. Swan is the named acquirer of KAMG.

80. SMG Aggregator is a Delaware limited liability company within the ownership stack of the Enterprise.

81. A majority of its equity is held by Ascend SMG Aggregator, an Ascend-advised fund, and physicians who rolled over equity in the 2023 transaction, including Dr. Lee, hold the remainder.

82. Ascend Capital is a Delaware limited partnership and the management company of the private-equity sponsor that brands itself Ascend Partners and transacts as Ascend Capital Partners.

83. The sponsor is headquartered in New York. It was co-founded by Dr. Richard Park, who also owns 100% of Swan.

84. Ascend structured and financed the SMG and KAMG acquisitions, and its principals manage the investment.

85. In litigation against Dr. Lee in Delaware, Swan relied on the sworn affidavit of Joshua Zenilman, an Ascend Partners principal who sits on the Board of Managers of SMG Aggregator, LLC.

86. Defendant Ascend SMG Aggregator, L.P. is a Delaware limited partnership formed on January 12, 2023.

87. It is the Ascend fund that holds the controlling equity in SMG Aggregator, LLC.

88. Its general partner is Ascend SMG Co-Invest GP, L.P., whose general partner is Ascend Capital Partners UGP, LLC. Ascend Capital and Ascend SMG Aggregator are referred to together as "Ascend."

89. AMM is a California corporation and an indirect subsidiary of the Enterprise that performs the non-clinical, administrative, and management functions

of SMG, including network administration, claims processing, and member attribution and transfer.

90. AMM implements the block-transfer capture mechanism alleged here.

91. Does 1 through 20 are entities or persons whose identities are presently unknown to Plaintiffs and who participated in, directed, or benefitted from the conduct alleged here, including additional Ascend, SMG Aggregator, rollover, and operating entities.

92. Plaintiffs will amend to name them when their identities are ascertained. Each Defendant acted as the agent, alter ego, or instrumentality of the others in furtherance of the common enterprise and scheme alleged here.

93. Each Defendant is responsible for a distinct part of the scheme.

94. Each participated in one or more of the mechanisms that give rise to the violations alleged below.

95. Swan is the named acquirer of SMG and KAMG.

96. SMG contracts with the health plans and maintains the physician network.

97. AMM performs member attribution and carries out the block transfers.

98. Ascend owns the controlling equity.

99. [redacted].

100. It structured and financed the acquisitions.

101. And it approved each of the challenged practices.

102. Each Defendant acted in furtherance of the common enterprise alleged here.

## IV. INDUSTRY BACKGROUND

103. Medicare Advantage is the private-plan alternative to traditional fee-for-service Medicare.

104. CMS pays a Medicare Advantage health plan a risk-adjusted, capitated amount each month for every enrolled member, based on the member's demographics and diagnosed conditions.

105. The health plans that serve Korean-language seniors in these counties do not themselves assemble local networks of physicians.

106. They delegate that function to independent practice associations, also called risk-bearing organizations or risk-bearing entities ("IPAs" or "RBEs").

107. An IPA contracts with a network of independent primary care and specialist physicians, accepts a capitated payment for each attributed member, and bears the financial risk of arranging the members' care.

108. The IPA profits from the spread between the capitation it receives and what it pays for physicians and care.

109. Medicare Advantage members are "attributed" to a particular IPA through their assigned primary care physician ("PCP").

110. When a member selects or is assigned a PCP, the health plan attributes that member, and the capitation he generates, to the IPA whose network includes that PCP.

111. Control of the PCP therefore means control of the member and the capitation.

112. A network of contracted PCPs is thus the essential input for competition among IPAs.

113. An IPA cannot serve members or earn capitation without physicians whose panels bring members with them.

114. A substantial share of Medicare Advantage seniors in Southern California are Korean-American and prefer to receive care in Korean.

115. The ability to assemble a network of Korean-speaking physicians is therefore the essential input for competition to serve them.

116. The SMG Enterprise told California regulators as much.

117. Only about 10.7% of physicians practicing in California speak any Asian or Pacific Islander language, and the subset who speak Korean is smaller still.

118. Korean is among the most common languages spoken by California Medicare beneficiaries with limited English proficiency.

119. And "language concordance between providers and limited English proficient individuals is associated with better health outcomes."

120. Korean-speaking physicians are scarce, and the IPA that controls them controls access to the Korean-senior Medicare Advantage population.

## V. THE RELEVANT MARKET

### A. Relevant Product Market

121. The relevant product market is the provision of independent-practice-association (risk-bearing-entity) managed-care network services to Medicare Advantage health plans for the care of Korean-American, Korean-language-preferring Medicare Advantage enrollees (the "Korean-Senior MA Network Services" market).

122. The service consists of assembling, contracting with, and administering a network of Korean-speaking primary care and specialist physicians capable of serving Korean-language Medicare Advantage members, and bearing the delegated financial risk for their care.

123. Medicare Advantage is a distinct product, separate from traditional fee-for-service Medicare and from commercial health insurance.

124. Medicare Advantage plans offer supplemental benefits, capped out-of-pocket costs, and coordinated provider networks that traditional Medicare does not.

125. Enrollees do not regard traditional Medicare or commercial insurance as reasonable substitutes.

126. And CMS bids, administers, and regulates Medicare Advantage county by county.

127. Within Medicare Advantage, no other service is a reasonable substitute for language-concordant Korean-Senior MA Network Services, from the standpoint of the health plans that must serve Korean-language members, and none constrains the price, quality, or terms of those services.

128. General-population and English-language IPAs cannot furnish these members comprehensible, culturally competent care.

129. Neither can Spanish-language or other non-Korean networks, or bilingual networks that lack Korean-language capability.

130. Traditional fee-for-service Medicare is not a reasonable substitute.

131. And a telephone interpreter is no substitute for a treating physician who speaks the patient's language.

132. This market is a cognizable line of commerce and a well-defined submarket.

133. Its boundaries are set by the practical indicia the law recognizes and by Defendants' own admissions. See *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

134. Korean-senior managed care has industry and public recognition as a distinct economic activity.

135. SMG and KAMG are, by their very names and marketing, organized around the Korean-American senior population, and Center holds itself out as a "Medicare HMO Network for Korean Seniors."

136. Announcing their 2025 merger, Defendants publicly described SMG and KAMG as "the two leading Asian-American-focused medical groups and physician networks in the United States."

137. They described the transaction as expanding "SMG's position as the largest Asian-American-focused medical group and physician network."

138. Announcing Ascend's 2023 acquisition of SMG, Defendants had already called SMG "the largest Korean-American-focused IPA."

139. In their own words, at the time, Defendants recognized a distinct Korean-American and Asian-American managed-care segment, and SMG's position as the largest firm in it.

140. The market has distinct customers with distinct needs: the Medicare Advantage plans that enroll Korean-language seniors.

141. Their demand derives from their members' needs. Korean-language-preferring seniors require Korean-speaking physicians and culturally competent care.

142. A general-population IPA that lacks Korean-speaking physicians cannot serve them.

143. Defendants admitted to regulators that their networks exist to arrange "culturally competent care for Asian and Asian-American (and especially Korean and Korean-American) seniors," and that language concordance materially affects the quality of care these members receive.

144. The scarcity of Korean-speaking physicians is a barrier that insulates this submarket from the broader market for managed-care services.

145. The market has specialized vendors.

146. The physicians who can serve this population, Korean-speaking PCPs and specialists, are a distinct and limited pool.

147. The IPAs that compete for them, including SMG, KAMG, and Center, are a small, identifiable set, not the hundreds of general IPAs that serve the broader California population.

148. In litigation it filed against Dr. Lee in Delaware, Swan's own verified complaint calls Center "a direct competitor of the Company."

149. Its briefs call Center "SMG's most significant and direct competitor" and "a competing RBE, providing services in certain of the same geographic areas as SMG (including the Los Angeles area), utilizing the same business model as SMG."

150. Health plans confirm, from their side of the market, that Korean-serving IPA network services are a distinct product they buy separately.

151. Every risk-bearing organization files a Statement of Organization with the California Department of Managed Health Care.

152. The filing lists the health plans the organization contracts with. Those filings show that Central Health Plan of California and Clever Care of Golden State each contract with all three Korean-serving IPAs: SMG, KAMG, and Center.

153. Both are Medicare Advantage plans organized to serve Asian-American and Korean-American seniors.

154. Astiva, another such plan, contracted with SMG, KAMG, and Center.

155. These plans look to the Korean-serving IPAs to build the Korean-language networks their members require.

156. For their Korean-language members, they rely on this small, identified set of competitors, not on the general-population IPAs that serve the broader market.

157. That confirms that the service is a distinct relevant product market, and that general IPAs are not a reasonable substitute.

158. SMG's own litigation confirms that these plans depend on the Korean-serving IPAs.

159. In an April 2025 lawsuit against Astiva, SMG alleged that it is "one of the largest IPAs serving the Korean American community."

160. It alleged that it and its affiliates serve approximately one-third of Astiva's Medicare Advantage enrollees.

161. And it alleged that without SMG's provider network, Astiva "would not be able to fulfill" its obligations for "network adequacy, cultural competency, and continuity of care." *Seoul Medical Group, Inc. v. Astiva Health, Inc.*, Compl. ¶¶ 3, 12, 21 (L.A. Super. Ct. filed Apr. 29, 2025).

162. Courts use the "hypothetical monopolist" test to determine whether a group of products or services is broad enough to be a relevant antitrust market.

163. The test asks whether a firm that was the only present and future seller of the products in a proposed market (a hypothetical monopolist) likely would

undertake at least a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT") for at least one product in the proposed market.

164. If the hypothetical monopolist could impose a SSNIPT without losing enough customers to make it unprofitable, the group of products or services is a properly defined market. U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.3.A (2023).

165. The Korean-Senior MA Network Services market satisfies this test.

166. A hypothetical monopolist of managed-care network services for Korean-language Medicare Advantage seniors in Los Angeles and Orange Counties likely would impose at least a SSNIPT, whether as a higher price or as worse quality, service, or terms.

167. Too few customers would switch to make the SSNIPT unprofitable.

168. The health plans that buy these services could not turn to IPAs that lack Korean-speaking physicians, because those networks cannot serve Korean-language members.

169. Nor could a plan avoid a SSNIPT by contracting directly with Korean-speaking physicians.

170. The plans that serve these members delegate network assembly to IPAs, and most of these scarce physicians are already in the Enterprise's network.

171. And the plans' Korean-language members would not switch to traditional fee-for-service Medicare or commercial coverage in numbers sufficient to make a SSNIPT unprofitable.

172. None of those is a reasonable substitute for language-concordant Medicare Advantage managed care.

173. A hypothetical monopolist could also target these customers.

174. IPA contracts with health plans are individually negotiated, a network knows which plans must serve Korean-language members, and those plans cannot obtain the service through other plans to avoid a SSNIPT.

175. Korean-Senior MA Network Services is therefore a relevant product market.

176. If the Court finds a broader market, that market is all IPA network services sold to Medicare Advantage plans in Southern California.

177. The Korean-Senior MA Network Services market is a distinct submarket within it.

178. Defendants have market power in that submarket, and the KAMG acquisition increased it.

**B. <u>Relevant Geographic Market</u>**

179. The relevant geographic market is Los Angeles and Orange Counties, California, considered together, and is a section of the country within the meaning of Section 7.

180. SMG and KAMG both operated and competed head-to-head in those counties before the acquisition.

181. Health plans buy Korean-serving networks across the two adjacent counties as a single competitive area.

182. Medicare Advantage networks are local. Members must obtain care from physicians within a reasonable distance of their homes.

183. Health plans build and price county-level networks. CMS sets payment by county, and the plans attribute members to networks within each county.

184. In their own regulatory filings, Defendants placed both SMG's and KAMG's California operations primarily in Los Angeles and Orange Counties.

185. A hypothetical monopolist of these services across the two counties could profitably impose a SSNIPT.

186. Neither members nor plans could practicably turn to IPAs in other regions.

187. In the alternative, Los Angeles County and Orange County are each a relevant geographic market.

188. Members are attributed and payment is set by county.

189. So a hypothetical monopolist in either county alone could also impose a SSNIPT.

190. In each county, SMG and KAMG were two of the few Korean-serving IPAs, and the acquisition combined them.

191. Defendants' acquisition and conduct are unlawful in the combined market and in each county market.

**C. <u>Market Power</u>**

192. Within the relevant market, the SMG Enterprise possesses substantial and durable market power.

193. In its own regulatory filing, SMG reported enrollment of between 25,000 and 50,000 members across its Medicare Advantage and commercial lines, primarily in Los Angeles and Orange Counties.

194. Defendants told regulators that KAMG's patients, "[a]s with SMG," are generally "65+ individuals who are Korean and prefer the Korean language."

195. Within the narrow market for Korean-language managed-care services, the combined SMG and KAMG networks serve about two-thirds of the Korean-language seniors in the relevant counties and account for most of the Korean-speaking physicians who serve them.

196. The relevant input for competition in this market is the primary care physician.

197. A Medicare Advantage member is attributed to an IPA through his assigned primary care physician, so an IPA cannot serve members or earn capitation without a network of PCPs whose panels bring members with them.

198. Specialists are a shared referral resource, not the attribution anchor.

199. The number of primary care physicians who serve Korean-language Medicare Advantage seniors in the relevant counties is small.

200. Defendants publicly advertise a combined network of "more than 5,000 primary care and specialist physicians."

201. But that figure counts specialists together with PCPs and spans seven states: California, Georgia, Hawaii, New Jersey, New York, Virginia, and Washington.

202. Defendants' own prior statements confirm the point.

203. Announcing Ascend's 2023 acquisition of SMG, they described SMG as serving "4,800 providers, including nearly 400 primary care physicians and more than 4,400 specialists" across those same seven states.

204. The overwhelming majority of the advertised total are therefore specialists, not the PCPs through whom members are attributed.

205. By Defendants' own representation to California regulators, the combined SMG and KAMG primary care network is "fewer than 150 PCPs."

206. The relevant denominator for Defendants' power, and for the foreclosure of rivals, is that small pool of primary care physicians serving Korean-senior members in Los Angeles and Orange Counties.

207. It is not the nationwide, all-specialty figure Defendants advertise.

208. The Enterprise's power is protected by high barriers to entry and expansion.

209. A new or expanding rival must assemble a network of scarce Korean-speaking physicians, obtain health-plan contracts, secure a risk-bearing license, and attract attributed members.

210. Each step takes time and capital.

211. A new network must register with the Department of Managed Health Care as a risk-bearing organization and meet its financial-solvency rules.

212. It must win delegation from each health plan.

213. And it must satisfy CMS network-adequacy standards.

214. Defendants' acquisitions and block transfers are designed to foreclose each of those steps.

215. Entry or expansion by other IPAs would not be timely, likely, or sufficient to defeat the Enterprise's market power or to counteract the acquisition's harm to competition.

216. The Enterprise grows by buying competing physician groups and practices, not by building a network itself.

217. That alone shows how hard a competing Korean-speaking network is to assemble.

218. Nor could the general-population IPAs reposition to replace the competition KAMG provided.

219. They lack Korean-speaking physicians, and the block transfers strip any physician they recruit of the patients who make him worth recruiting.

220. And the KAMG acquisition eliminated one of the few firms able to provide or enable that competition.

### D. <u>The Related Input Market for the Services of Korean-Speaking Physicians</u>

221. Defendants' conduct also harms competition in a related input market: the market for the professional services of Korean-speaking physicians who serve Medicare Advantage patients in the relevant counties.

222. IPAs such as SMG, KAMG, and Center compete to contract with these physicians.

223. Their Korean-language capability and established Korean-senior patient panels make them the essential input for serving the Korean-senior Medicare Advantage population.

224. The services of these physicians are a relevant input market and line of commerce within the meaning of Section 7: a general, non-Korean-speaking

physician is not a reasonable substitute, and an IPA cannot serve Korean-language members without them.

225. This input market satisfies the hypothetical monopsonist test, the buyer-side version of the same test.

226. It asks whether a firm that was the only present and future buyer of the services in a proposed market (a hypothetical monopsonist) likely would impose at least a small but significant and non-transitory reduction in price or other worsening of terms for at least one seller.

227. A hypothetical monopsonist of the services of Korean-speaking physicians who serve Medicare Advantage patients in Los Angeles and Orange Counties likely would do so, in the form of lower pay or worse contract terms.

228. Too few physicians would switch to other buyers to make the cut unprofitable.

229. Los Angeles and Orange Counties are the relevant geographic market for this input, because that is where these physicians practice and serve Medicare Advantage members.

230. They could not practicably sell their Medicare Advantage services to buyers outside the region, or outside Medicare Advantage, without abandoning their patients and practices.

231. The test is not hypothetical here.

232. After the KAMG acquisition, the Enterprise stopped paying performance bonuses to most physicians, and moved to cut base pay [redacted], while CMS raised what it pays the plans.

233. A relevant market may be defined around purchases from a targeted group of sellers when prices are individually negotiated and the buyer can identify the sellers who have fewer options.

234. Both conditions hold here.

235. The Enterprise sets each physician's pay in an individual contract, and it can identify from its own attribution data which physicians speak Korean and hold Korean-senior panels.

236. A Korean-speaking primary care physician cannot escape by turning to traditional Medicare, commercial patients, or a hospital job.

237. His Korean-senior patients are enrolled in Medicare Advantage plans, which pay their doctors through IPAs.

238. The SMG Enterprise has substantial power as a buyer of Korean-speaking physicians' services.

239. These physicians are scarce.

240. The SMG and KAMG networks together account for the substantial majority of those who serve Medicare Advantage patients in the relevant counties.

241. The KAMG acquisition combined the two largest buyers of their services.

242. Rival buyers cannot readily expand to discipline the Enterprise.

243. A competing network gains nothing from recruiting a Korean-speaking primary care physician unless his attributed members can follow him.

244. The block-transfer capture described below defeats exactly that.

245. It entrenches the Enterprise's buyer power by stripping physicians who move to a competing buyer of the attributed members and capitation that give their practices value.

## VI. THE ANTICOMPETITIVE SCHEME

### A. The Private-Equity Roll-Up of Korean-American Managed Care

246. In October 2023, Ascend Capital acquired SMG in what Swan's own public court filing calls an "$850 million transaction."

247. It placed the physician-facing professional corporation, Swan, owned by Ascend co-founder Dr. Park, atop a stack of Ascend-controlled entities: SMG; SMG

Aggregator (majority-owned by Ascend SMG Aggregator, L.P.); and Swan Rollover Holdco LLC ("Swan Rollover").

248. AMM performs all non-clinical functions.

249. Economic control of the Enterprise, and of the risk-adjustment and network decisions at issue, resides in the Ascend-controlled entities.

250. Ascend controls the Enterprise today.

251. [redacted].

252. [redacted].

253. [redacted].

254. [redacted].

255. [redacted].

256. Dr. Park, an Ascend co-founder, owns 100% of Swan, which owns SMG and KAMG.

257. [redacted].

258. Ascend approved the KAMG acquisition, the cuts to physician compensation, the increase in AMM's share of revenue, and the decision to sue Dr. Lee. Ascend's preferred return gives it every reason to widen the gap between what the plans pay and what the doctors receive.

259. Having acquired the largest Korean-American IPA, the Enterprise moved to acquire its closest rival and to lock up the physicians who could enable competition.

**B. <u>The Unlawful Acquisition of KAMG</u>**

260. KAMG was a physician-owned independent practice association, formed in 1989, that competed directly with SMG.

261. As Defendants told California regulators, KAMG operated in Los Angeles and Orange Counties, the same counties as SMG.

262. It served approximately 20,000 patients enrolled in Medicare Advantage and commercial plans, and generated $78.8 million in revenue in 2023.

263. KAMG's patients were, in Defendants' own description, generally "individuals who are Korean and prefer the Korean language," many of them 65 years of age or older.

264. KAMG was, in short, a direct competitor of SMG in the relevant market.

265. KAMG was engaged in commerce and in activities affecting commerce. It contracted with Medicare Advantage plans funded by the federal Medicare program.

266. Effective in early 2025, the Enterprise acquired KAMG through Swan.

267. KAMG became a wholly owned subsidiary.

268. Its physician shareholders became minority equity holders in the Ascend-controlled Aggregator.

269. Announcing the transaction, Defendants described SMG and KAMG as "the two leading Asian-American-focused medical groups and physician networks in the United States."

270. They described the merger as expanding "SMG's position as the largest Asian-American-focused medical group and physician network."

271. KAMG contributed its network of Korean-language primary care physicians serving Korean-senior members in Los Angeles and Orange Counties, a substantial share of the small pool of such physicians.

272. Defendants told California regulators that the combined SMG and KAMG network "will have a combined network of fewer than 150 PCPs."

273. As Defendants also told regulators, KAMG's physician shareholders received equity in SMG Aggregator in the transaction.

274. Defendants did not submit the transaction to the U.S. Department of Justice or the Federal Trade Commission, as they confirmed in their filings with California regulators.

275. Before the acquisition, SMG and KAMG competed head-to-head.

276. They competed to recruit and retain Korean-speaking physicians, to win contracts with Medicare Advantage health plans, and to attract and keep Korean-senior members.

277. Both contracted with the same health plans, including Central Health Plan of California, Clever Care of Golden State, and Astiva.

278. At Astiva alone, SMG had about 8,000 members and KAMG about 2,200.

279. That rivalry disciplined the price, quality, and service each offered.

280. The acquisition ended it.

281. It also eliminated a direct, independent competitor and increased concentration in an already-concentrated market.

282. It removed one of the few firms able to anchor or enable a competing Korean-senior network.

283. And it denied rivals, including Center, the chance to contract or combine with KAMG's physicians and to serve its members.

284. The effect of the acquisition may be, and has been, substantially to lessen competition and to tend to create a monopoly, in violation of Section 7 of the Clayton Act.

285. The combination's effect on price appeared almost immediately.

286. On March 17, 2025, eight days after Defendants announced the merger, counsel writing on behalf of both SMG and KAMG sent Astiva Health a notice of material breach. The letter invoked the merger: "as recently announced, SMG acquired KAMG."

287. The letter then stated: "SMG's ~8,000 Astiva members, coupled with KAMG's ~2,200, represent one-third of Astiva's total membership."

288. The Enterprise demanded, "at minimum," a "$450 PMPM floor (at a 1.0 RAF)," and warned of "immediate termination of the agreement." *Seoul Medical Group, Inc. v. Astiva Health, Inc.*, Compl. Ex. 2.

289. A $450 PMPM floor is a minimum payment of $450 per member per month for an average-risk member. In 2024, Astiva had paid SMG about $285 per member per month for Part B services. The Enterprise thus used the members it acquired with KAMG as leverage to demand a higher price from a health plan serving Korean seniors.

290. The acquisition's effect on concentration triggers a presumption of illegality.

291. SMG and KAMG were two of the small number of IPAs that maintain Korean-speaking networks capable of serving Korean-language Medicare Advantage seniors in the relevant counties, and the acquisition reduced the number of such dedicated competitors.

292. Defendants' own public filings and available public data reflect that SMG and KAMG together account for a substantial majority of the Korean-language Medicare Advantage senior lives in the relevant market.

293. The Herfindahl-Hirschman Index (HHI) measures market concentration.

294. It is calculated by squaring each firm's market share and adding the results.

295. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.

296. As alleged below, the post-acquisition HHI substantially exceeds 1,800, the threshold at which a market is highly concentrated.

297. The increase in the HHI from the acquisition, equal to twice the product of the merging parties' market shares, far exceeds 100.

298. A merger that creates or further consolidates a highly concentrated market and increases the HHI by more than 100 points is presumed to substantially lessen competition and is presumptively unlawful. U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 2.1 (2023).

299. These shares are estimates, but they are grounded in Defendants' own filings and other available data, not in conjecture.

300. SMG reported enrollment of between 25,000 and 50,000 members, primarily in Los Angeles and Orange Counties.

301. KAMG served approximately 20,000 patients in Los Angeles and Orange Counties.

302. Each risk-bearing organization reports its enrollment to the Department of Managed Health Care. In 2024, before the acquisition, SMG reported 40,000 to 49,999 enrollees, KAMG 15,000 to 19,999, and Center fewer than 5,000.

303. Because members are attributed through their primary care physicians, these figures also track each network's share of the Korean-speaking primary care services it buys.

304. And the two together operate a combined network of fewer than 150 primary care physicians serving the Korean-senior population.

305. These three networks are the IPAs organized to serve Korean-language seniors in the relevant counties. Measured by their reported enrollment, SMG held about 70% of the lives they served, KAMG about 25%, and Center less than 5%.

306. Some Korean-speaking physicians also contract with general-population IPAs. Even assuming those IPAs serve as much as 30% of the relevant market, SMG held about 49% of it and KAMG about 17%. The combined firm holds about two-thirds.

307. On those conservative figures, the post-acquisition HHI exceeds 4,000, and the acquisition increased it by more than 1,600. Both far exceed the thresholds at which a merger is presumed unlawful. Merger Guidelines § 2.1.

308. The combined share, about two-thirds, is more than double the roughly 30 percent share sufficient to presume illegality. See *United States v. Philadelphia National Bank*, 374 U.S. 321, 363–64 (1963).

309. The same shares are a reasonable measure of the acquisition's effect in the input market.

310. Members are attributed through their primary care physicians, so each network's share of Korean-senior members tracks its share of the Korean-speaking primary care physicians' services it buys.

311. The acquisition is therefore presumptively unlawful in the input market as well.

312. Defendants assured regulators that there would be "ample choice" because hundreds of IPAs operate statewide.

313. That assurance is beside the point and misleading.

314. Those hundreds of general-population IPAs, including the large networks with one thousand to four thousand physicians, do not serve the Korean-language senior population, which requires the scarce Korean-speaking physicians that SMG and KAMG together controlled.

315. Within the relevant market, the acquisition combined two of the leading competitors.

### C. <u>The Post-Acquisition Suppression of Physician Compensation</u>

316. Having combined the two largest buyers of Korean-speaking physician services, the Enterprise used its enhanced buyer power to cut the compensation it pays its network physicians.

317. Before the acquisition, KAMG was the closest alternative buyer for the many Korean-speaking physicians.

318. The acquisition removed it.

319. The block-transfer capture keeps Center and other rivals from filling that gap.

320. With no competing buyer able to fill that gap, the physicians had to accept the cuts.

321. Through 2025, SMG paid a fixed capitation for Dr. Lee's patients of $110 per member per month for Medicare-only patients and $130 for patients with both Medicare and Medi-Cal, who make up most of his panel.

322. After the KAMG acquisition, the Enterprise moved to cut those rates.

323. In the weeks after it terminated the Lee Practice in May 2026, SMG twice sent the Lee Practice a "2026 Notice Amendment" to its physician agreement.

324. [redacted].

325. [redacted].

326. The amendment said it would take effect August 1, 2026, [redacted]."

327. It is a form notice, offered on take-it-or-leave-it terms.

328. The Enterprise sent it to the primary care physicians throughout its network.

329. The amendment also capped each physician's total compensation, base capitation and every incentive combined, [redacted].

330. The reduction was not confined to base capitation.

331. The Enterprise had historically paid participating physicians a performance bonus that, for many, exceeded the base capitation itself.

332. For years before the KAMG acquisition, SMG paid Dr. Lee a performance bonus of more than [redacted] a year. SMG pays each year's bonus the following spring.

333. In the spring of 2025, months after the KAMG acquisition, SMG paid a bonus to only a handful of physicians in its entire network. It cut Dr. Lee's about in half, to a little over [redacted].

334. In 2026, SMG paid Dr. Lee no bonus, and few, if any, physicians in the network received one.

335. SMG requires every physician it contracts with to use AMM, the Enterprise's own management company. The physicians have no choice.

336. After Swan took control of SMG in 2023, the Enterprise raised AMM's fee from about 10 percent to about 25 percent of the network's revenue. Dr. Lee, a physician in the network, saw the increase firsthand.

337. After the Enterprise acquired KAMG, it raised the management fee charged to KAMG's network from about 10 percent to the same 25 percent.

338. The higher fee left less money to pay the physicians. Raising it had the same effect as cutting their pay. And because the Enterprise owns AMM, the money stayed with the Enterprise and its owners.

339. The physicians paid the higher fee and stayed, because they had nowhere else to go.

340. These cuts were not a response to falling revenue.

341. SMG is paid by the health plans on a capitated basis, generally as a percentage of the premium the plans receive from CMS.

342. CMS increased Medicare Advantage payments to plans for both 2025 and 2026, including an average increase of 5.06 percent for 2026.

343. The capitation flowing to the Enterprise rose while the compensation it paid the physicians who generate that capitation fell.

344. And, as alleged above, after the KAMG acquisition the Enterprise demanded higher, not lower, rates from health plans.

345. The competitive rate is observable in the Enterprise's own history.

346. Before the KAMG acquisition, when SMG had to compete with KAMG for Korean-speaking physicians, it paid $110 and $130 per member per month for Dr. Lee's services.

347. After the acquisition, while CMS raised what it pays the plans, the Enterprise cut that rate to [redacted].

348. The suppression threatens the supply of Korean-language primary care available to Medicare Advantage members.

349. SMG has said so itself.

350. Its counsel told Astiva that when payments to providers are curtailed, "downstream health care providers and their patients see immediate impacts, including disenrollment by network and ancillary providers that result in increased wait times and patient dissatisfaction." *Seoul Medical Group, Inc. v. Astiva Health, Inc.*, Compl. Ex. 2.

351. A buyer that pays less than the competitive price for an input obtains less of it over time, and the members bear the loss.

352. The Enterprise's own conduct confirms the exercise of buyer power. It cut the bonus of Dr. Lee, whom Swan calls "one of the top revenue-generating participants in SMG's network," in half in 2025 and paid him none in 2026.

353. The compensation squeeze extends across the Enterprise's network.

354. In March 2026, an independent specialty practice in the network circulated a letter to the network's primary care physicians.

355. The letter reported that, for an extended period, the Enterprise had failed to pay for many of the services the practice rendered, straining its ability to sustain normal operations.

356. That independent account corroborates that the Enterprise has used its post-acquisition dominance to suppress and withhold what it pays the physicians and practices in its network.

357. These reductions are the exercise of monopsony power.

358. The block-transfer capture keeps the physicians' patients with the Enterprise when the physicians move, so moving to a rival does not let them escape the cuts.

359. That inability is powerful evidence of monopsony power.

360. In a competitive market for their services, rival risk-bearing entities such as Center would bid to contract with them, and their compensation would rise toward competitive levels.

361. The Enterprise also demands exclusivity.

362. After the KAMG acquisition, the Enterprise demanded that a Korean-speaking primary care physician in the combined network deal with it exclusively.

363. When she refused, it terminated her.

364. That demand contradicts what the Enterprise told California regulators to win clearance of the KAMG acquisition: that the SMG and KAMG networks are "by default, non-exclusive, meaning that PCPs can choose to participate in other IPAs."

**D. <u>The Block-Transfer Capture Mechanism</u>**

365. Medicare Advantage members are attributed to the Enterprise through their assigned primary care physician.

366. So when a physician leaves, the Enterprise has the health plans reassign, or "block transfer," his panel to other physicians in the SMG network.

367. The capitation stays with the Enterprise.

368. The physician arrives at a rival without most of his patients.

369. That is not a neutral administrative step.

370. A rival can recruit the physician, but the Enterprise keeps the members who make him worth recruiting.

371. Dr. Lee's termination shows how the capture works. The Enterprise terminated Dr. Lee, a leading Korean-speaking primary care physician with a panel of roughly 1,200 patients, citing his diagnosis coding, a ground Plaintiffs dispute.

372. When it terminated Dr. Lee, the Enterprise immediately identified other Korean-speaking physicians in its own network, contacted his patients, and moved to

reassign his members to those physicians, retaining the capitation those members generate.

373. Most of his patients stayed with the Enterprise.

374. The block-transfer mechanism harms competition, not merely the terminated physician.

375. It keeps most patients with the Enterprise even when their physician moves to a rival.

376. It raises rivals' cost of assembling a competing Korean-speaking network, by stripping any recruited physician of the panel that would make him valuable.

377. And it deters physicians from dealing with rivals at all.

## VII. ANTICOMPETITIVE EFFECTS AND ABSENCE OF JUSTIFICATION

378. Defendants' acquisition and course of conduct have harmed and are harming competition in the relevant market, in each of the ways antitrust law recognizes.

379. First, they have reduced the number of competitors.

380. The acquisition eliminated KAMG, one of the few independent Korean-serving IPAs, and increased concentration in an already-concentrated market.

381. Second, they have raised the costs of the rivals that remain and kept them from efficient scale.

382. The block-transfer capture denies Center and other rivals the Korean-speaking physicians and attributed members they need.

383. Those rivals must assemble a network at supracompetitive cost, and cannot reach the scale needed to compete for health-plan business.

384. Third, Defendants have foreclosed and deterred entry and expansion.

385. A new or expanding rival cannot obtain the scarce physicians, the members, or the network adequacy that entry requires.

386. The result is a market with fewer competitors, disabled rivals, and no new entry to discipline the Enterprise. Korean-American Medicare Advantage seniors lose the benefits of competition among IPAs, including choice of network, quality, and service.

387. Defendants' conduct degrades the quality of care delivered to Korean-American Medicare Advantage seniors.

388. That is a form of anticompetitive harm the antitrust laws recognize independent of price.

389. Quality, continuity, and language-concordant service are core dimensions on which IPAs compete for these members, and the block-transfer capture and KAMG acquisition suppress that competition.

390. Members are attributed and captured through their assigned physician, and most stay behind when that physician moves to a competing network.

391. The scheme thus severs the established, Korean-language physician-patient relationships on which quality care for this population depends, destroying continuity of care.

392. And because competition is foreclosed and members have no rival network to switch to, the Enterprise faces no competitive discipline to preserve quality.

393. It can worsen the care Korean-senior members receive, the very "worsening of quality, service, or terms" the hypothetical-monopolist analysis measures, without losing the capitation those members generate.

394. These harms fall on a captive population.

395. Korean-language-preferring seniors cannot get comprehensible, culturally competent care from a non-Korean-speaking physician, so they cannot escape the Enterprise's network by switching to the general-population IPAs that serve the broader market.

396. And because the block-transfer capture reassigns them before they can follow their chosen physician to a competing Korean-speaking network, they cannot escape by moving with their doctor either.

397. Trapped between a language barrier on one side and the Enterprise's restraints on the other, these patients have nowhere to turn.

398. Their inability to leave is what insulates the Enterprise from any competitive check on the quality, continuity, and terms of their care.

399. This quality harm is not theoretical.

400. When the Enterprise terminated Dr. Lee and block-transferred his panel, elderly Korean-language-preferring seniors were abruptly reassigned.

401. They were moved from the physician who had for years managed their chronic conditions and spoken with them in their own language, to physicians not of their choosing.

402. That degradation of care is the direct and intended consequence of the suppression of competition alleged here.

403. Foreclosure in this market is measured by the capture of the key primary care physicians in the relevant counties.

404. It is not measured by a headcount against Defendants' nationwide, all-specialty roster.

405. Through the acquisitions, the Enterprise controls most of the physicians a rival would need to anchor a competing Korean-senior network.

406. The Enterprise's own online directory lists roughly ninety-five Korean-speaking primary care physicians in Los Angeles and Orange Counties.

407. Measured against that number, the physicians the Enterprise controls are a substantial share of the physicians a rival would need.

408. That they are a minority of Defendants' advertised national roster does not matter.

409. What determines whether competitors can serve Korean-senior patients is control of the scarce Korean-speaking primary care physicians in Los Angeles and Orange Counties.

410. The size of a nationwide specialty network does not.

411. The block-transfer capture closes the practical pathway by which a rival IPA competes: recruiting a primary care physician who brings his panel of members.

412. The combined effect denies rivals such as Center a cost-effective way to assemble a competing Korean-speaking network.

413. It keeps them from reaching the scale needed to constrain Defendants' power.

414. Each act also restrains competition on its own.

415. The KAMG acquisition unlawfully combined two of the leading competitors in the relevant market.

416. The block-transfer capture entrenches the foreclosure the acquisition produced.

417. Defendants' conduct also harms competition in the related input market for the services of Korean-speaking physicians.

418. By acquiring KAMG, the Enterprise eliminated head-to-head competition to recruit and retain those physicians.

419. By capturing departing physicians' panels through block transfers, it strips the physicians of the leverage that competition for their services would otherwise supply.

420. These effects are not merely predictable.

421. They have occurred. After combining the SMG and KAMG networks, the Enterprise stopped paying most physicians' performance bonuses.

422. It moved to cut base capitation [redacted] for dual-eligible patients, and capped total physician pay [redacted]

[redacted]. And it kept the higher AMM fee it began charging after Swan took control, and raised KAMG's physicians to the same fee.

423. The result is suppressed physician pay and mobility, less competition among IPAs for Korean-speaking physicians, and the foreclosure of rivals from the essential input needed to serve Korean-senior members.

424. There is no legitimate, procompetitive justification for this conduct that could not be achieved by substantially less restrictive means.

425. This conduct serves only to suppress competition.

426. It is broader than any legitimate purpose requires.

427. That is true of the acquisition of a competitor and the block-transfer capture.

428. The Enterprise's "synergies" are its margins. Since Swan took control, it has raised the share of revenue AMM keeps from about 10 percent to about 25 percent.

429. After the KAMG acquisition, it cut what it pays physicians.

430. That moves money from doctors to the sponsor.

431. It is not an efficiency.

432. Cuts in what the Enterprise pays physicians stem from the loss of competition.

433. They cannot be treated as efficiencies.

434. Any purported efficiencies are not verifiable, merger-specific, or cognizable.

435. In any event, they cannot prevent or outweigh the substantial harm to competition.

## VIII. ANTITRUST INJURY AND STANDING

436. Dr. Lee and the Lee Practice sell Korean-speaking primary care services.

437. The Enterprise is the dominant buyer.

438. Plaintiffs have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

439. Their injury does not come from a better rival.

440. It comes from Defendants locking up the physicians and members that competing buyers need.

441. When a physician leaves, the block transfers move his patients to Enterprise physicians first.

442. That keeps networks like Center from bidding effectively for his services.

443. Center sought to recruit Dr. Lee.

444. But after SMG terminated him, it began reassigning his patients to its own doctors, and most of them stayed with SMG.

445. The foreclosure of competing networks is itself a reduction of competition.

446. Center is one of very few meaningful competing Korean-serving networks.

447. Shutting it out leaves Defendants with little competitive constraint.

448. Korean-speaking Medicare Advantage seniors lose choice, quality, and continuity of care.

449. Physicians lose pay and the freedom to move.

450. Plaintiffs' injury and the injury to competition flow from the same foreclosure.

451. Plaintiffs' injury is inextricably intertwined with the harm in the network-services market: shutting Korean-speaking physicians out of rival networks is the means by which Defendants shut those networks out of the market.

452. The Enterprise also cut what it pays.

453. Through 2025, SMG paid $110 to $130 per member per month for Dr. Lee's services.

454. After the termination, it sent the Lee Practice an amended agreement at [redacted].

455. And after the KAMG acquisition, it cut Dr. Lee's bonus in half in 2025 and paid him none in 2026, after paying him more than [redacted] a year in the years before. It also raised the fee every network physician must pay its management company, AMM.

456. A buyer facing real competition for these physicians could not have cut their pay this way without losing them.

457. The Enterprise cut their pay and kept them, because its physicians had nowhere else to go.

458. Each Plaintiff's injury is its own.

459. Dr. Lee lost the performance bonus, which SMG paid to him individually. The Lee Practice held the SMG physician agreement and lost any suppressed compensation paid under it.

460. Dr. Lee sells his services in the same market and faces continuing injury from the acquisition and the lock-in of physicians.

461. Each Plaintiff seeks damages only for its own loss. Both Plaintiffs seek injunctive relief.

462. Neither seeks the other's loss, the value of what Dr. Lee sold in 2023, or damages for the termination itself.

463. The termination matters because it was the means of the block transfer.

464. Dr. Lee's minority equity in SMG Aggregator, LLC does not offset that loss.

465. It gives him no control over the Enterprise.

466. Plaintiffs are efficient enforcers. Their injuries are direct and measurable.

467. Each Plaintiff's injury is the gap between what the Enterprise paid it and what a competitive market would have paid.

468. Both Plaintiffs also face threatened injury as sellers facing a dominant buyer, which supports injunctive relief, including divestiture.

469. Neither duplicates Center's injury as a rival or the members' injury as consumers.

470. And the relief they seek would restore competition among buyers.

471. Their interests run with competition, not against it.

472. They have standing under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, including to seek divestiture.

**COUNT I**

**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18): Unlawful Acquisition of KAMG (Against Swan, SMG Aggregator, LLC, and Ascend)**

473. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

474. Each Defendant named in this Count acquired KAMG, directly or indirectly, within the meaning of Section 7. Swan acquired KAMG's stock directly. Through the friendly-physician structure, KAMG's economics now run to SMG Aggregator, LLC and Ascend. KAMG became party to the administrative services agreement under which SMG Operating Company, LLC, an Aggregator subsidiary, performs all of KAMG's non-clinical functions. And KAMG's physician shareholders received equity in SMG Aggregator, LLC as part of the price. Ascend financed the acquisition and controls each acquiring entity. It approved the acquisition.

475. SMG and KAMG were direct competitors in the relevant market, and the SMG Enterprise's acquisition of KAMG was an acquisition of the stock or assets of a competitor. The effect of the acquisition may be substantially to lessen competition,

and to tend to create a monopoly, in the relevant market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, by, among other things:

(a) increasing concentration in the relevant market to levels that are so clearly indicative of lessened competition as to render the acquisition presumptively unlawful;

(b) eliminating the head-to-head competition between SMG and KAMG that benefited Korean-senior members, the health plans that serve them, and the physicians who treat them;

(c) entrenching the SMG Enterprise's dominance and foreclosing rivals, including Center, from the Korean-speaking physicians and attributed members necessary to compete;

(d) reducing choice, quality, continuity of care, and service for Korean-American Medicare Advantage seniors; and

(e) reducing competition generally in the relevant market.

476. The acquisition likewise may substantially lessen competition in the related input market for the services of Korean-speaking physicians. It eliminated the head-to-head competition between SMG and KAMG to recruit and retain those physicians. And it increased the SMG Enterprise's power as a buyer of their services. It has done so by, among other things, (a) increasing concentration among buyers of those services to presumptively unlawful levels; (b) lowering the compensation paid to those physicians; (c) worsening their contract terms, including through [redacted]; (d) reducing their ability to move to competing networks; and (e) threatening the supply of Korean-language primary care available to Medicare Advantage members.

477. There are no verifiable, merger-specific, or cognizable efficiencies that prevent or outweigh these harms, and the Enterprise pursued no less anticompetitive alternative.

478. This Count is asserted by both Plaintiffs. Each is a seller of Korean-speaking physician services in the input market. In that market, the acquisition eliminated competition between SMG and KAMG as buyers and enhanced the Enterprise's buyer power. After the acquisition combined the two largest buyers of those services, the Enterprise cut what it pays network primary care physicians. It stopped paying performance bonuses to most physicians across the network, cutting Dr. Lee's in half in 2025 and paying him none in 2026, raised the fee charged to KAMG's physicians from about 10 percent to about 25 percent, moved to cut base pay to [redacted], and capped total pay [redacted], as alleged above. Plaintiffs' injury followed the acquisition.

479. Plaintiffs are threatened with continuing loss and damage, including the permanent loss of KAMG as an independent buyer of their services. Both Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, including an order of divestiture unwinding the acquisition. See *California v. American Stores Co.*, 495 U.S. 271, 281, 295–96 (1990). Each Plaintiff is also entitled to treble damages for its own loss under Section 4, 15 U.S.C. § 15.

**COUNT II**

**Monopolization (Section 2 of the Sherman Act, 15 U.S.C. § 2) (Against All Defendants)**

480. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

481. The SMG Enterprise possesses monopoly power in the relevant market for Korean-Senior MA Network Services. It possesses monopsony power in the related input market for the services of Korean-speaking physicians. That power is shown by its dominant share of each market, its enrollment and revenue, and the high barriers to entry and expansion that protect it. Defendants themselves erect and reinforce those barriers.

482. The Enterprise's monopsony power is further shown by its demonstrated ability, after combining the SMG and KAMG networks, to cut the compensation it pays network physicians. It stopped paying performance bonuses to most physicians, moved to cut base capitation [redacted] for dual-eligible patients, and capped total physician pay [redacted], and raised the fee every network physician must pay its management company, AMM, from about 10 percent to about 25 percent, without losing those physicians to any competing buyer.

483. The Enterprise has willfully acquired and maintained that monopoly and monopsony power through exclusionary conduct, not through a superior product, business acumen, or historic accident. Its power began with the acquisitions, which brought most of the scarce Korean-speaking physicians and their attributed members under its control. It maintains that power through several restraints working together, and the claim depends on no single one. They are: the acquisition of KAMG; the demand that a network physician deal with it exclusively, and her termination when she refused; and the block-transfer scheme that captures physicians' panels and capitation. This conduct unnecessarily excludes and handicaps competitors. It lacks any legitimate business justification that could not be achieved by substantially less restrictive means.

484. Defendants' monopolization and monopsonization have harmed competition and caused Plaintiffs the antitrust injury alleged in the section titled "Antitrust Injury and Standing." Both Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 26, and each Plaintiff is entitled to treble damages for its own loss under 15 U.S.C. § 15.

## COUNT III

**Attempted Monopolization (Section 2 of the Sherman Act, 15 U.S.C. § 2)**

**(Against All Defendants)**

485. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

486. To the extent the Enterprise does not already possess monopoly power in the market for Korean-Senior MA Network Services, or monopsony power in the market for the services of Korean-speaking physicians, it has attempted to acquire that power. It engaged in the exclusionary and anticompetitive conduct described above with the specific intent to monopolize and monopsonize those markets. That conduct includes the acquisition of KAMG, and the block-transfer capture. There is a dangerous probability that it will succeed, given its dominant position, the elimination of KAMG, and the foreclosure of the physicians and patients rivals need to compete.

487. This attempted monopolization and monopsonization has caused Plaintiffs the antitrust injury described above. Both Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 26, and each Plaintiff is entitled to treble damages for its own loss under 15 U.S.C. § 15.

## COUNT IV

**Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.) (By Both Plaintiffs Against All Defendants)**

488. Plaintiffs reallege and incorporate by reference each preceding paragraph as though fully set forth herein.

489. This Count is asserted by both Plaintiffs. Defendants' conduct constitutes unlawful and unfair business acts and practices within the meaning of California Business and Professions Code sections 17200 et seq. It is unlawful because it violates the Clayton Act and the Sherman Act. It is unfair because its harm to competition and to Korean-American Medicare Advantage seniors is not

outweighed by any legitimate business justification, and violates the policy and spirit of the antitrust laws.

490. Plaintiffs have suffered injury in fact and lost money as a result, including the bonus SMG cut in 2025 and stopped paying in 2026. To the extent SMG paid any compensation for Dr. Lee's services to the Lee Practice rather than to Dr. Lee, the Lee Practice suffered that loss. Plaintiffs have no adequate remedy at law for the continuing restraint. Damages cannot restore Korean-senior patients' access to the physicians of their choice. Damages cannot end the ongoing foreclosure of competing networks. And the harm recurs each month the restraints remain in force. Plaintiffs are entitled to injunctive relief under California Business and Professions Code section 17203.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

A. Adjudging and declaring that Defendants' acquisition of KAMG violates Section 7 of the Clayton Act, and that Defendants' conduct violates Section 2 of the Sherman Act and the Unfair Competition Law;

B. Ordering divestiture of KAMG and such other structural relief as is necessary to restore competition lost through the unlawful acquisition;

C. Ordering Defendants to hold KAMG separate pending divestiture;

D. Permanently enjoining Defendants from operating the block-transfer capture scheme;

E. Requiring Defendants to notify each Medicare Advantage member block-transferred from a departing physician since the KAMG acquisition that the member may choose that physician again;

F. Awarding each Plaintiff its damages in an amount to be proven at trial, trebled as provided by 15 U.S.C. § 15;

G. Awarding such equitable relief as is appropriate under California Business and Professions Code section 17203;

H. Awarding Plaintiffs their costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. §§ 15 and 26; and

I. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 12, 2026

Respectfully submitted,
PROCEL LEVINE, LLP

By: /s/ Brian Procel
Brian Procel
Jeremiah M. Levine
Attorneys for Plaintiffs Young-Jik Lee, M.D. and YJ Lee, M.D. Corp.